IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2018

**STEVIE GIBSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 12-02182      James M. Lammey, Judge

_____

**No. W2017-01971-CCA-R3-PC**

_____

Petitioner, Stevie Gibson, appeals the denial of his petition for post-conviction relief, in which he challenged his Shelby County Criminal Court convictions for two counts of second degree murder and one count of aggravated robbery. On appeal, Petitioner argues that he was denied the effective assistance of counsel based on trial counsel's failure to argue at trial that Petitioner could not form the requisite *mens rea* for the charges of first degree murder and aggravated robbery due to his voluntary intoxication at the time of the offense. Additionally, Petitioner asserts that he was denied a full and fair hearing due to the post-conviction judge's refusal to recuse himself. After a thorough review of the facts and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Rosalind Elizabeth Brown, Memphis, Tennessee, for the appellant, Stevie Gibson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Stephanie Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

Following a jury trial, Petitioner was convicted of two counts of second degree murder[1] and one count of aggravated robbery. On direct appeal, this court summarized the relevant facts at trial, as follows:

Betty Zieba testified that the victim, Joshua Martin, was her son. At the time of his death, he worked as a department manager at Dillard's. The victim drove a black Camaro convertible. Zieba had been in the victim's car recently and knew that one of her debit cards was in its glove box. She also knew that the victim carried his driver's licenses, his work keys, and his debit card in the car's console.

On cross-examination, Zieba stated that she was aware of her son's homosexuality. She had no knowledge of him arranging dates online.

James Dinkins testified that he lived in the apartment next door to [Petitioner's]. On November 7, 2011, Dinkins arrived home at about 11:15 p.m. At about 11:45 p.m., as he was watching television, Dinkins heard some "screaming." He opened his door to check on the commotion, and when he opened his door, he "heard the next door slam hard, boom. Just like that." Dinkins heard nothing further and did not call the police.

When Dinkins opened his door at about 7:00 a.m. the next morning, he saw the police and a body "laying at the door." He told the police about the noise that he had heard the night before.

Maurice Ingram, [Petitioner's] brother, testified that [Petitioner] called him at about 3:20 a.m. on November 8, 2011. [Petitioner] told him that something was wrong and asked him to come over. Ingram, who lived across the street from [Petitioner], got dressed and walked over to the [Petitioner's] apartment. [Petitioner] was standing outside and told Ingram that he had met someone online. This man came over to [Petitioner's] apartment, and they had sex. The man then asked to use the bathroom. After the man came out of the bathroom, the man walked into the kitchen, grabbed a knife, and tried to rob [Petitioner]. A struggle over the knife

---

[1] Petitioner was charged with first degree premeditated murder and first degree felony murder, alternatively.

ensued, and [Petitioner] stabbed his visitor. Ingram asked [Petitioner] if the visitor was dead, and [Petitioner] stated that he did not know. Ingram called their father and sister and told them what had happened. After their father and sister came over, they called the police. Also at the apartment before the police arrived were Ingram's other brother, his mother, and his step-mother.

Ingram went into the apartment after he realized that his "three little cousins" were inside. Before the police arrived, Ingram and another of his brothers got the children and took them to Ingram's house. Ingram then returned to [Petitioner's] apartment. By that time, the police had arrived.

Ingram saw the victim's body when he went into the apartment. He stated that the body was on the floor, partially covered with a blanket. The body was unclothed. He did not move or otherwise disturb the body.

On cross-examination, Ingram described [Petitioner] as a "great big brother." He stated that [Petitioner] had been the choir director at church and had attended college for two or three years. Ingram knew that [Petitioner] was homosexual. He described [Petitioner] as "cool, calm, and collective [sic]." On the night in question, Ingram saw a cut in the palm of [Petitioner's] right hand. When he asked [Petitioner] about it, [Petitioner] told him that, "when he was tussling with [the victim] with the knife he grabbed it to keep from sticking him and they tussled over the knife and that's how he got the cut on his hand." Ingram also noticed that a vase of flowers had been knocked to the floor.

On re-direct examination, Ingram stated that he was not aware that [Petitioner] had a conviction for resisting official detention. He also stated that he was not aware of whether [Petitioner] used crack cocaine.

Kirsty Kirby testified that she was the store manager of the Dillard's where the victim had worked. She promoted him from a sales associate to a sales manager in 2008. She explained that the victim had prior management experience and a college degree. The victim's annual salary at the time of his death was $42,000.

Kirby testified that the victim closed the store on the evening of November 7, 2011. She explained that the store closed at 9:00 p.m., and it generally took thirty minutes to close the store. Because the victim

- 3 -

sometimes closed the store, he had a set of the store keys. Those keys were returned to her after the victim's death.

On cross-examination, Kirby stated that the victim had been the sales manager of the cosmetics department. Kirby did not socialize with the victim outside of the workplace.

Officer Gregory Patrick of the Memphis Police Department ("MPD") responded with Officer Benjamin Huff to the scene at about 4:30 a.m. November 8, 2011. In the front doorway of [Petitioner's] apartment, they found a body laying face down, "half covered in a sheet." After [Petitioner] told Officer Huff that he had stabbed the victim, Officer Patrick told Officer Huff to handcuff [Petitioner] and place him in their patrol car. They later took [Petitioner] to the police station.

Officer Benjamin Huff of the MPD testified that, while he and Officer Patrick were on the scene, [Petitioner] told him that he had stabbed the victim. After he took [Petitioner] into custody and was preparing his report, [Petitioner] told him that "it was self-defense." [Petitioner] told Officer Huff that he had met the victim online and that, after the victim came over, the victim tried to rob him.

Officer Huff described the scene: "the body was wrapped from the head to the mid-torso lying face down. The rest of it was nude. We walked through the apartment. Just a lot of blood just, I mean, all around the apartment." He added that [Petitioner] had been wearing clean clothes when they took him into custody.

On cross-examination, Officer Huff reviewed his report and then recalled that [Petitioner] had told him that he and the victim had had sex and that the victim then tried to rob him. He told Officer Huff that the victim had a knife, they struggled over it, and [Petitioner] took the knife from the victim and stabbed him. [Petitioner] kept telling Officer Huff that it was self-defense.

On re-direct examination, Officer Huff stated that he did not recall [Petitioner] having any injuries. On re-cross examination, Officer Huff stated that [Petitioner] did not advise them that he was injured.

Officer Charles Cathey of the MPD stated that he worked in the crime scene investigation division. He responded to the scene and took

photographs. Some of the photographs admitted into evidence depicted the victim's body, wrapped in bedclothes, lying next to a large plastic bin. According to Officer Cathey, there was a white bag in the bin that appeared to have blood on it.

In the kitchen, Officer Cathey found a knife in the kitchen sink. The knife appeared to have blood on it. He also found some credit cards and a driver's license on a windowsill in the kitchen. One of the credit cards had the victim's name on it. In the kitchen trash can, he found clothes that appeared to have blood on them. On the kitchen table, he found a set of keys that had earlier been identified as the victim's work keys. He also found another set of keys, which belonged to the victim's car. In the bathroom, the shower curtain appeared to have blood on it.

Sergeant Joe Stark of the MPD testified that he searched the victim's car at the crime scene. The car was locked and he opened it with the keys that had been found on [Petitioner's] kitchen table. He opened the glove box and found it empty except for "a couple of pieces of paper." He found the car's owner's manual in the front passenger seat. He found this "kind of strange, kind of like somebody had been through the car." He did not notice any blood in the car.

Officer Anthony Barbarotto of the MPD testified that he reported to the crime scene on November 10, 2011, to assist in the collection of evidence. He collected from [Petitioner's] apartment a shipping box with a label addressed to the victim.

Lieutenant Anthony Mullins of the MPD testified as an expert in blood stain pattern analysis. He examined the crime scene, including bloody clothes that were found there. He testified that his observations and examinations led him to the following conclusions:

> The conclusions that I reached at the overall crime scene is [sic] that it appears to me that the assault started in the kitchen and moved into the living room and into the entryway. I can't say for certain if the victim made it all the way to the front door to try and get out or not. There is blood evidence there that suggests that it came from a bleeding source in the entryway. Those big round stains, they don't necessarily come from holding something with blood on it. It comes from a source that's resupplying, a bleeding source.

There's transfer blood stains on the light switch and doorknob of that door but that could come from either the victim trying to get out with blood on his hands or a suspect moving around with blood on his hands or her hands.

Regardless, all the circles and squares and all you saw [in photographs depicting bloodstains he marked at the crime scene] are indications that an assault took place there and you can see a couple of different areas so there's movement and the victim is up and moving when the assaults occur. That's why you have them higher on the wall and lower on the wall. If the victim was on the floor and being beaten or stabbed repeatedly you would see that type of thing just above the floor and going upward from there. But the ones that we showed you are going downward from an upper point.

And most of the stains were 4 to 5 feet up on the wall. So that seems to me the victim was moving through the living room and being assaulted as he's moving. Was he trying to escape? I can't say. Was he trying to go get help or get a weapon? I can't say what he was doing. I just can tell you that it appears the victim is moving through the apartment and being assaulted as he's moving but he never—it does not appear he ever got out of the apartment.

As to the bloody pants that were found at the scene, Lt. Mullins testified that blood stains indicated that someone's fingers had gone into the back pockets. Also, some of the victim's driver's licenses and credit/debit cards "had what appeared to be bloody thumbprints or fingerprints or transfers." He added that the pants had been found in the kitchen at some distance from the victim.

On cross-examination, Lt. Mullins stated that he did not know if the victim was wearing the pants at the time someone reached into the pockets or if it was the victim or someone else who reached into the pockets. He testified, "The thing I can tell you is that somebody with bloody, at least bloody fingers, went into those pockets. Now what they did and what they found, that I can't tell you." He also acknowledged that he did not know if the victim's driver's licenses and credit/debit cards had been in the pockets or if they had been picked up with bloody fingers from another location. Lt. Mullins also acknowledged that people other than police officers had

been in the apartment before the police arrived and could have been responsible for some of the transfer bloodstains. Moreover, the transfer bloodstains he found at the entryway indicated that someone had left the apartment after the stabbing took place.

On re-direct examination, Lt. Mullins stated that there was evidence that blood on the scene had been "tampered with":

> There was a large plastic storage bin, not huge but it was about 2 feet deep. I guess you could say it was medium size but it had quite a bit of blood that had pooled inside. It was still liquid. A lot of blood and spatter around the edges with the blood inside the bottom of that plastic bin. The comforter had a lot of blood on it where it was wrapped around the victim. There was, like, large pillowcases that were around his feet and there was some transfer in the entryway. And some as I point out before is over the existing dripped blood, which means somebody was moving through that. There was [sic] some bloody footprints inside the entryway within that smeared blood so it looked to me like somebody was moving the victim through there or moving something through there that would have blood on it and a lot of blood on it. And where the victim was and where the tub was and I think it may have been in one of the photos, it appeared to me that maybe the victim had been over that at some point and bleeding into that. This is a large amount of blood. This isn't like just a little bit that spilled into it. This is a lot of blood dripping into this plastic bin. So it appeared to me that maybe there was some effort to move the body or conceal the amount of blood or get rid of some blood or something.

Lt. Mullins added that it was common for an individual who was stabbing someone else to also cut themselves on their finger.

On cross-examination, Lt. Mullins acknowledged that someone could be cut on their hand while trying to take a knife away from someone else.

Officer David Smith of the MPD took photographs of [Petitioner] after he had been taken into custody. He did not notice anything unusual as he was photographing [Petitioner's] hands. He also took photographs of

- 7 -

the clothing [Petitioner] was wearing. Under his jeans, [Petitioner] was wearing red pajama pants. Officer Smith noticed what appeared to be blood on the pajama pants. Officer Smith collected [Petitioner's] jeans and pants and then used an "alternate light source" on [Petitioner's] upper body to detect blood evidence. He did not detect any blood evidence on the [Petitioner's] upper body, including [Petitioner's] hands, in this manner.

Lieutenant Vivian Murray of the MPD testified that she was the case coordinator for this case. She interviewed [Petitioner] and took his statement. [Petitioner] told her that he had two cuts on the palms of his hands, and she had an officer take photographs of his hands. She saw the cuts at the base of the palm of [Petitioner's] hand(s), and she stated that they were not bleeding. [Petitioner] did not complain of pain and did not ask for medical attention. He told her that he received the cuts "during the process of the act, [that] the edge of the knife blade nicked him on . . . the palm of his hand."

[Petitioner's] written statement was admitted into evidence. He explained that his three minor cousins were in the apartment with him that night, sleeping. He said that the "incident" occurred at approximately 11:30 p.m. to midnight. His statement included the following narrative:

> I met [the victim] online and we decided that he was going to come to my apartment. He came to my apartment and he had a box and some wine. He proceeded in my apartment through the door, set the stuff down, and sat on the couch and we got undressed and he proceeded to give me oral sex. During climax, he went to the restroom. I was getting dressed. I was kneeling down with my back to him. After he left out the restroom, he proceeded in the kitchen. Next thing I knew, I heard him say "Give me your wallet." I turned around and saw that he had a knife in his hand. I grabbed the knife from him and proceeded to stab him in the chest and then eventually I walked around behind him and I was constantly stabbing him. He fell down on his knees in front of the TV. He was just screaming. Then he proceeded towards the door and I stabbed him in his back again and the knife was stuck in his back. He opened the door and I slammed the door. Then that's when he fell down in the doorway and I took the knife out of his back and put it in the kitchen sink. Then I began trying to call my brother Maurice

and I was calling my cousin too but neither one of them answered. Then at that point, I didn't even know his name. So that's when I proceeded to go through his pockets. At this point, he was lying on his stomach and his back was to me so I reached in his back pockets and that's when I found 2 identifications and 2 credit cards and a Wells Fargo business card. Then I turned him over on his back, went in his front pockets, and then took his clothes off him. Then I threw the clothes in the trash and I grabbed the comforter off the little small couch and wrapped him up in it. I went in my room and got the pillow case, put the pillow case on his two legs and wrapped his upper body in the comforter and paced the floor and then the floor was getting soaked with blood so I proceeded towards my front closet and got a plastic tote I keep my dog's food in and I proceeded to lay him across it so it can catch the blood but it took me a minute to get him up there cause he's much heavier than I am. He laid across the container for a couple of minutes and then it gave out. I tried about 4 times to get him on the tote, but it kept falling over. He fell back to the floor where he laid. I just kept on walking back and forth, constantly calling my brother and cousin. I scared [sic] and frantic to call my parents and I never called the police cause I had my cousin and the[m] in the bedroom and I didn't know what was going to happen to them cause their mom is in jail and their dad wasn't there and I didn't want them to end up in state custody like I've been. Some hours passed and my brother eventually answered his phone around 3:00 a.m. something and I asked him to come to the apartment now. I was standing on the balcony when he was walking up. So I proceeded to walk to the front door and by the time I opened the door, Maurice saw him laying there and started crying and asked me what happened. By that time, Maurice was on the phone with one of my little brothers that usually come to my house every night around that time cause that's when he's getting off work and then me and Maurice was standing outside. At some point, my mom and my sister Amelia came to my apartment and they were walking up with my brothers Lee and Maurice and I ran towards my mom and was crying. She was asking me what happened. She told me to sit down on the stairs so I was sitting on the stairs telling my mom what happened. I went and sat in my brother Lee's

car and that's when my dad and his wife pulled up. My dad asked me why I hadn't called the police and that's when I told him about the kids being in the house. Then my dad and Maurice went back to my apartment and came out with the kids. Then I think Maurice was on the phone with the police. After Maurice was on the phone with the police, that's when my dad told me to go put on some warm clothes. That's when I went and put on the clothes I have on now and went and sat in the truck with him. The police pull up and my dad tell [sic] my mom to get out the truck and go get the police. That's when all of us started walking back towards the apartment. So the police was asking who[se] apartment was it and I informed them that it was me and my friend's apartment and they was like "Well, were you the one that found the gentleman?" and I was like "Yeah. I'm the one that stabbed him" and they proceeded to take me to the police car.

[Petitioner] explained that he prevented the victim from leaving the apartment because he "didn't want him to go outside with the knife in his back and all of the blood on him nor did I want him to fall over the rail." He reiterated that he did not call the police because of his minor cousins. Asked why he went into the victim's front pockets after he had retrieved the victim's identification from his back pockets, [Petitioner] stated that he "was looking for [the victim's] cell phone or something at that particular time." He stated that he wanted to try and contact someone who knew the victim. Asked why he stripped the victim, he stated, "Remorse. I took the clothes off because I felt sorry at that moment. I said 'Look what I've done' and I was throwing myself my own pity party. So I wrapped him up in a blanket and threw his clothes in the garbage." He did not attempt any first aid. [Petitioner] stated that he had smoked crack cocaine a couple of hours before stabbing the victim.

On cross-examination, Lt. Murray acknowledged that, during her conversation with [Petitioner], [Petitioner] told her that he took the knife from the victim and "just lost it." [Petitioner] also told her that he had twice been treated for attempted suicide.

On re-direct examination, Lt. Murray clarified that [Petitioner] told her that he had gone through the victim's car after the stabbing and brought into his apartment a box from the car.

Dr. Marco Ross, a medical examiner at the Shelby County Office of the Medical Examiner, testified that he performed an autopsy on the victim. The victim was five feet, seven inches tall and weighed 167 pounds. Dr. Ross described the victim's injuries:

[T]here was a stab wound on his right cheek, another stab wound on the right side of the neck. There was a stab wound on the back of the head on the left side, another stab wound on the back of the head on the right side. On the back of the neck there were five stab wounds. There was on the chin an incised wound. On the front of the neck was another incised wound. And on the left side of the neck was yet another incised wound. And again, on the back of the neck in addition to the five stab wounds there was also an incised wound on the back of the neck.

On the chest there was a stab wound on the left upper part of the chest and another stab wound located on the left mid-front of the chest region. On the back there were eight stab wounds scattered over various areas, predominantly of the upper to mid-back area. There were incised wounds or cut wounds on the palm of the left hand. In addition to all these injuries there was [sic] some abrasions or scrape marks on the forehead, some contusion or bruising on the right side of the nose as well as the right side of the upper lip, an abrasion or scrape mark on [the] lower lip, some abrasions or scrape marks on the left side of the chin, a scratch on the right temple extending onto the right ear, several scratches on the neck just below the area of incised wound kind of above the base of the neck where it connects to the chest. There were two scratches on the front of the right arm. On the back of the left hand were some additional scratches and scrape marks and another scrape mark on the palm of the left middle finger.

Dr. Ross explained that

[a] stab wound . . . just means that the depth of the injury's penetration in the body exceeds the length of the defect on the surface of the skin, whereas an incised wound which is usually caused by more of a cutting action rather than a stabbing action, creates a defect that generally tends to be

greater in length on the surface of the skin than the depth of penetration into the body.

Dr. Ross stated that three of the stab wounds—one in the front of the body and two in the back of the body—hit vital organs. Dr. Ross opined that the victim's cause of death was multiple stab wounds. He also opined that the victim's wounds were consistent with those which would be caused by the knife found in [Petitioner's] kitchen sink. Dr. Ross' autopsy report was admitted into evidence. The report reflected a "pathological diagnosis" of twenty-five stab and incised wounds.

The State rested its case-in-chief after Dr. Ross' testimony, and the defense presented no witnesses. The jury convicted [Petitioner] of second degree murder as a lesser-included offense of first degree premeditated murder as charged in the first count; second degree murder as a lesser-included offense of first degree felony murder as charged in the second count; and aggravated robbery as charged.

*State v. Stevie Gibson*, No. W2013-02015-CCA-R3-CD, 2014 WL 4100158, at *1-7 (Tenn. Crim. App. Aug. 19, 2014), *perm. app. denied* (Tenn. Dec. 18, 2014) (footnotes omitted). The trial court merged the two murder convictions and imposed a total effective sentence of thirty-seven years' incarceration. *Id.* at *9.

On direct appeal, this court noted that the trial court improperly enhanced Petitioner's sentences on the basis of the trial court's conclusion that the proof supported a conviction for first degree murder rather than the lesser-included offense of second degree murder. *Id.* at *12. This court determined that "the trial court's dissatisfaction with (1) the General Assembly's decision that second-degree murder is a lesser-included offense of first degree felony murder, and (2) the jury's verdict of second degree murder instead of first degree felony murder should have played no role in the trial court's sentencing decisions." *Id.* (internal citation omitted). Nevertheless, this court upheld the sentences imposed by the trial court based on its review of the record, and the Tennessee Supreme Court denied further review. *Id.* at *1, 13-14.

On September 17, 2015, Petitioner filed a timely pro se Petition for Post-conviction Relief. Following the appointment of counsel on December 17, 2015, Petitioner filed an Amended Petition, alleging that he was denied the effective assistance of counsel based on trial counsel's failure to: "pursue evidence on Petitioner's history of drug abuse and usage to develop proof to attempt to negate his intent on the crimes of murder and aggravated robbery"; "present any evidence of Petitioner's history of drug

usage in its proof despite Petitioner repeatedly raising [this] as an issue"; and "pursue Petitioner's intoxication and drug usage as a defense with respect to a jury instruction."

*Motion to Recuse*

On August 31, 2017, a week before the post-conviction hearing, Petitioner filed a Motion for Recusal by Trial Court in Post-Conviction Hearing ("Motion to Recuse"), alleging that the court had "shown a bias toward Petitioner in the sentencing phase of the trial by improper[ly] imposing a consecutive sentence" and requesting that the court recuse itself from further post-conviction proceedings. The post-conviction hearing, held on September 6 and 8, began with Petitioner arguing his Motion to Recuse. Petitioner asserted that recusal was necessary due to comments made by the court at Petitioner's sentencing hearing that "showed a bias" against Petitioner. Petitioner argued that the court's comments "indicated that if the . . . [c]ourt had his way that [Petitioner] would have been found guilty of first degree murder[,]" rather than the lesser-included offense of second degree murder. Petitioner pointed to a portion of his direct appeal opinion, which stated that "'the Trial Court's strong reliance on his personal disagreement with the jury's verdict was not consistent with the purposes and principles of our sentencing act.'"

The post-conviction court denied the Motion to Recuse, stating:

Well, I don't see anything in there that indicates that I [am] biased in any way.

. . .

I don't have any specific recollection, in fact, I don't even remember the facts of this case; Y'all might want to refresh my memory. So, I mean, I have no animosity towards [Petitioner][.]"

. . .

And I can only guess, but I have no problem with it going forward, and no animosity towards [Petitioner], and I don't recall the facts of the case, [and] I can't say why I thought it was first degree murder or why I thought it was second degree murder, or what not. I can only assume that the Court of Criminal Appeals did the right thing by affirming me[.]

- 13 -

Monalisa Gibson testified that she was Petitioner's mother. She stated that she raised Petitioner until he was three years old but that his grandparents took care of Petitioner thereafter because Ms. Gibson's "life was complicated" by the fact that she was "a dope dealer" and drug user at the time. Ms. Gibson testified that there were times when she and her eight children did not have food and "didn't have lights" in their home. Ms. Gibson also stated that Petitioner revealed as an adult that he had been sexually abused by a neighbor when he was young. Ms. Gibson recalled a time when Petitioner had a shotgun and "was trying to kill [himself]." She stated that the police were called and Petitioner ended up in "the mental place." Ms. Gibson said that Petitioner was there "two or three times." She stated that Petitioner suffered from depression and that he was HIV positive, but he did not take his medications properly. Ms. Gibson testified that she learned in 2006 or 2007 that Petitioner was abusing drugs.

Ms. Gibson testified that, on the night of the offense, she went to Petitioner's residence and saw the victim lying on the floor. Ms. Gibson stated that, when she questioned Petitioner about what had happened, he acted "like he couldn't respond" and like "he was out of it." She stated that she could recognize that Petitioner was high on drugs because, "I'm an addict and I know when someone is high." Ms. Gibson testified that Petitioner would get high "everyday." She asserted that Petitioner was "on a binge when he did what he did[,]" meaning that he had not slept in three or four days due to his drug usage. Ms. Gibson said that she told trial counsel about Petitioner's background and drug use at the time of the offense.

On cross-examination, Ms. Gibson acknowledged that, in the two written statements she provided investigators about the offense, she did not tell investigators that Petitioner was on a four-day drug binge, had not slept for days, and that he was high on crack cocaine. Ms. Gibson agreed that Petitioner told her after the offense, "Mama, I'm in trouble and I'm gonna be gone a long time because dude tried to stab me . . . ." She further agreed that, in her experience, forty dollars-worth of crack cocaine would be "[t]wo or three rocks" and that this amount would not last an addict four days. Ms. Gibson stated that because she regularly used crack cocaine, her high did not last for a long time. Although she maintained that Petitioner was high on the night of the offense, Ms. Gibson acknowledged that his unusual behavior when she arrived at his residence could have been because he was "depressed or in shock" over having stabbed the victim. Ms. Gibson testified that she had previously stolen things in order to buy drugs.

Petitioner's father, Stevie Ingram, testified that he had been aware of Petitioner's drug problem. Mr. Ingram stated that he also abused drugs when Petitioner was young, which resulted in Petitioner going to live with Mr. Ingram's parents. He stated that, when

Petitioner was high on crack cocaine, Petitioner would "zone[] out" and be disrespectful and that Petitioner's personality would change "[a] whole lot." Mr. Ingram recalled that Petitioner stole an Xbox and traded it for some crack cocaine.

Mr. Ingram testified that, after stabbing the victim, Petitioner called him around 3:00 a.m., but Mr. Ingram did not answer the phone because he was asleep. After Petitioner called Mr. Ingram again around 5:00 a.m., Mr. Ingram and his wife went to Petitioner's residence and saw the victim lying on the floor. Mr. Ingram testified:

> The man was lying on the floor and I said ["Petitioner,] what happened?["] He said ["]Dad, I don't know, I don't know.["] I said, ["Y]ou need to go in there and put on some warm clothes . . . and call 911 cause you done messed up.["]

Mr. Ingram stated that Petitioner was high and "zoned out" and that he talked to trial counsel about possibly making Petitioner's intoxication a part of Petitioner's defense. However, trial counsel never asked Mr. Ingram to testify regarding Petitioner's intoxication.

On cross-examination, Mr. Ingram agreed that he did not tell investigators that Petitioner was high and "zoned out" when he arrived at Petitioner's residence. He explained that was because the responding officer "addressed it himself" by asking if Petitioner was "on something." Mr. Ingram acknowledged that he reviewed discovery with trial counsel, including Petitioner's statement to police in which Petitioner stated that he had stabbed the victim in self-defense and that he had used forty dollars' worth of crack cocaine a couple of hours before the murder. Mr. Ingram agreed that Petitioner's version of events was that "he was attacked, took the weapon away, and that he used it to stab the victim" and that Petitioner did not waiver from that story.

Petitioner stated that he told trial counsel about his difficult childhood, being molested as a child, his mental health issues, and the extent of his drug abuse. Petitioner acknowledged that he discussed his statement to police and what he told his family members about the murder with trial counsel. Petitioner agreed that he and trial counsel discussed strategy and the use of a theory of self-defense. Petitioner said that trial counsel advised him it was not necessary to testify because his statement to police established that he acted in self-defense. Petitioner agreed that trial counsel's strategy was successful as it resulted in a conviction for second degree murder instead of first degree murder.

Petitioner testified that he and trial counsel discussed the robbery charge and how it might look bad to a jury that Petitioner was a daily drug user because items were

missing from the victim. Petitioner stated that trial counsel had no strategy to defend against the robbery charge. He claimed that he and trial counsel never discussed the intent required to commit aggravated robbery and said that he did not understand how he was charged with the offense because he did not take anything from the victim before his death.

Petitioner testified in detail about his personal history. He stated that he was taken away from his parents when he was a child and raised by his grandparents. Petitioner stated that a neighbor molested him daily from the ages of nine to twelve, and he learned he was HIV positive shortly after he graduated from high school. Petitioner stated that, after high school, he completed two and a half years of college, but then started caring for his mother after she was beaten up over a drug dispute. Petitioner explained that his drug abuse "took a turn for the worse" around this time.

Petitioner testified that he worked for a Mexican restaurant and obtained a management position, but he was fired after he failed a drug test and his employer caught him cashing checks for other employees. Petitioner then began working "odds and end jobs."

Petitioner testified that he used drugs daily and that his drug of choice was crack cocaine. He said that he also routinely drank alcohol and smoked marijuana. He stated that he could not hold steady employment due to his drug use. Petitioner attended rehab for ninety days but relapsed following the death of his uncle. According to Petitioner, this led to a four-month drug binge that lasted up to the night of the murder. He estimated that he used $100 worth of crack cocaine every day and that, during this time, his entire objective was to get high. Petitioner claimed that he sometimes hallucinated and had lapses in memory when high on drugs. According to Petitioner, he did not help to pay for his drug habit. He stated that he bought drugs using his unemployment check, money he made on the side from his "alternative lifestyle" as a male entertainer in gay clubs, and from "doing women['s] hair." He stated that he lived with a partner and a cousin, and he said that his partner paid all of their bills.

According to Petitioner, he was intoxicated on the day of the murder; he said that he used $40 worth of crack cocaine before the victim arrived at his residence, and he used another $100 worth of crack cocaine earlier that day. He acknowledged, however, that he only told the police about the $40 of cocaine, stating that he did not think the other amount was relevant at the time. He stated that his family knew he used that much crack cocaine.

Petitioner recalled that he chatted with the victim through an online forum and invited the victim over to his residence, where they had sex. He explained that he and his

partner had an "open relationship" and that he met people for sex from this online forum regularly. Petitioner testified that he did not remember anything else about his encounter with the victim, except that he recalled stabbing the victim. Petitioner said he thought the victim was trying to hurt him, though he said he could not remember what set him off.

Petitioner admitted that he gave police a detailed statement about the murder just hours after the offense, and he recalled telling the police most of the information in his statement. He further admitted that he told his family members that he killed the victim in self-defense. However, Petitioner claimed that the details in his police statement were "very inconsistent" because he could no longer recall all of the details provided in his statement. He claimed that he did not touch the victim's belongings, except for his clothes, which Petitioner threw in a trash can. Petitioner stated that he looked at the victim's identification because he did not know the victim's real name.

Petitioner admitted that he killed the victim but claimed that he did not have the intent to kill him when he met with the victim. Petitioner further claimed that he never said he intended to rob the victim. He stated that he was not a violent person but that he had tried to commit suicide one time when he was "delirious" from not taking his HIV medication.

On cross-examination, Petitioner acknowledged that he received a mental evaluation before trial, which indicated that Petitioner was able to appreciate the wrongfulness of his conduct when he killed the victim. However, Petitioner claimed that he was never evaluated regarding the effect of his intoxication on his mental condition at the time of the murder.

Trial counsel testified that he had been practicing law since 1974 and that he had handled "lots" of criminal trials, including more than ten murder cases. Trial counsel believed that he was successful in representing Petitioner because the jury returned a guilty verdict on the lesser-included offense of second degree murder. Trial counsel stated that Petitioner gave a statement to police that alleged self-defense and that his trial strategy was to use Petitioner's statement to police to prove self-defense. Trial counsel determined that self-defense was the only viable defense under the circumstances. Petitioner told police officers and his family that he acted in self-defense, and his family members also reported to police that Petitioner acted in self-defense. Additionally, Petitioner told trial counsel that he stabbed the victim in self-defense, and Petitioner's description of what happened was consistent throughout the proceedings.

Trial counsel stated that his strategy on the aggravated robbery charge was to attack the sufficiency of the evidence relating to whether a robbery had even occurred. Trial counsel recalled that he tried to establish the defense theory through Petitioner's

police statement and by trial counsel's cross-examination of witnesses. Trial counsel advised Petitioner against testifying but he explained to Petitioner that it was his own decision to make.

Trial counsel stated that a claim of voluntary intoxication would have been "totally inconsistent" with what Petitioner told police and his family. Trial counsel said there was "no real question about [Petitioner's] mental state." Trial counsel and Petitioner discussed Petitioner's drug use, but trial counsel stated that he did not have "any reason to believe" that Petitioner's drug use "was a factor in his decision to act as he did on that evening." Trial counsel explained that he had Petitioner evaluated prior to trial and that the results of the evaluation would not have supported a mental defense. Trial counsel also noted that voluntary intoxication was not a complete legal defense to the charges, although it could have been used to mitigate Petitioner's intent or culpability. He also stated that a voluntary intoxication defense would have required expert testimony. Trial counsel discussed Petitioner's drug use with Petitioner's family, and the jury did hear evidence that Petitioner used $40 worth of crack cocaine a few hours before the murder.

In denying the claims in the Amended Petition, the post-conviction court determined:

> Well, trying to second guess the strategy of a defense lawyer years after the offence--after the trial is problematic. I think the allegation is that he should have put on proof that--I suppose that it can be alleged that you can put on proof that you were intoxicated which [led] you to think you were being robbed, I suppose; I don't know, which would mean you could put on mistakenly believe that you were being robbed and you needed to defend yourself. So, in that aspect I can see defense's point, however, there's nothing in the record to indicate that this was actually--I mean the detail of [Petitioner's] statement clearly negates that. I mean, he wasn't blacked out. He remembers minute details of what happened. So, that would lead the Court to believe, looking at the facts, looking at the testimony of what [Petitioner] had to say and [trial] counsel, that that was never really an issue and it was never really even contemplated that that type of evidence would be put forward. I think the only actual proof that was presented and the jury decided that they believed it was the things that were missing from the victim's car that were inside the house. Of course voluntary intoxication, at least at the time of this trial--excuse me, could negate specific intent and, of course, murder second degree is not a specific intent crime; murder first degree is, murder second degree is not. This much talk about the intent required on the murder perp--I mean with two counts of murder and they found him guilty of murder second as a lesser in

- 18 -

both. So, it appears that the jury, on their own, decided to believe that this was not a premeditated act and that it was a knowing act, which--just because the jury charge on voluntary intoxication wasn't given, it seems like they may have taken into consideration on their own because they did find him guilty of a lesser included offence. In retrospect, in reading the Court of Criminal Appeals opinion--and I don't have any specific recollection of this sentencing hearing, in reading what I said, I think I was more--I was talking more about part B of the *Burns* [t]est and how many criminal court judges are of the opinion that it doesn't make sense that you can rob someone and someone dies during that and to be found guilty of second degree, but now I kind of see what they were saying. In this instance, it was a knowing killing and then the taking was after the killing. So, it wasn't like it was a murder in the perpetration of a robbery, it was a robbery during the perpetration of a second degree murder. So, I can see now in retrospect maybe my criticism of the jury was misplaced. However, my comments that were also--they're there, were to the effect of--and I should have been more clear that there's--under the sentencing guideline, by a preponderance of the evidence, I think there was more proof that this was murder first degree than second degree, but the jury disagreed with me or I disagreed with the jury. That's neither here nor there. My comments that seemed to be critical, I have to explain now, were not critical of [Petitioner], but were critical of the jury. I was merely pointing out I thought it was murder first degree and the jury gave him a break. So, I hope I made sense today.

Going back to this post[-]conviction, under the test of, I believe it's *Strickland*, that he had a very grave error and because of that grave [error] [Petitioner] was prejudiced; I can't say that is the case. This was a strategy that they had from the very beginning. I believe [trial counsel] when he says from the very beginning this was going to be self[-]defense, that was totally consistent with everything and that there was very little proof of a robbery. In fact, the statement says that the victim was trying to rob him. So, I could see his belief that the jury would not return a verdict of guilty on the aggravated robbery and that they had a very good chance on the self[-]defense claim, but the physical proof contradicted all that and apparently the jury went the other way. But to say it was error when he had him mentally evaluated, they said that he was competent and a[n] insanity defense could not be met.

. . . .

- 19 -

I don't know, I don't see where . . . [Petitioner] has really pointed out that there was any error in what [trial counsel] [did]. In fact, he got a murder second lesser which, you know, in a case like this would be considered a win. [Petitioner] will one day see the light of day whereas people convicted of murder first degree never will. And I can't say that since there was no--there was no error on his--it was just trial strategy. You can't second guess it now. So, since there was no error that I can see, then there can be no prejudice that would warrant setting this verdict aside and granting a new trial. So, petition for post-conviction relief is denied[.]

In a written order, the post-conviction court found that Petitioner failed to carry his burden of proof as to both the deficient performance and prejudice prongs of the *Strickland* analysis. Moreover, the post-conviction court found that Petitioner and his witnesses "were less than candid with the court" and that "trial counsel's testimony was very convincing."

This timely appeal follows.

## Analysis

### Motion to Recuse

Petitioner asserts that he was denied a full and fair hearing due to the post-conviction judge's refusal to recuse himself, despite having a bias against Petitioner as evidenced by the judge's "strong reliance on his personal disagreement with the jury's verdict" during sentencing. Petitioner further contends that, at the post-conviction hearing, the post-conviction judge "would not even give the appearance of neutrality." Petitioner contends that the post-conviction judge granted all of the State's objections and denied Petitioner's objections; limited Petitioner's and his witnesses' testimony regarding Petitioner's background; did not admonish a prosecutor when she could be overheard saying, "cry me a river" when Petitioner was testifying; denied Petitioner's sister an opportunity to testify as a witness; and gave no consideration to Petitioner's argument before denying the petition. The State responds that Petitioner's motion was procedurally deficient and did not present a valid reason for recusal.

A trial judge should recuse him or herself whenever the judge "has any doubt as to his ability to preside impartially in a criminal case or whenever his impartiality can reasonably be questioned." *Pannel v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). Additionally, recusal is appropriate "when a person of ordinary prudence in the judge's position would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d

810, 820 (Tenn. Crim. App. 1994). The judge generally need not recuse him or herself if the bias or perceived bias is "based upon actual observance of witnesses and evidence during trial." *Id.* However, if the judge's bias is "so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial." *Id.* Adverse rulings by a trial court do not, standing alone, establish judicial bias requiring recusal of the trial court. *See, e.g., Herrera v. Herrera*, 944 S.W.2d 379, 392 (Tenn. Ct. App. 1996).

Tennessee Supreme Court Rule 10B provides that a party seeking recusal or disqualification of a judge "shall do so by a timely filed written motion," supported by an affidavit and alleging with specificity the grounds for the motion. Tenn. Sup. Ct. R. 10B § 1.01. "'[R]ecusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality.'" *State v. Antonio Freeman*, No. M2012-02691-CCA-10B-CD, 2013 WL 160664, at *4 (Tenn. Crim. App. Jan. 15, 2013) (quoting *Duke v. Duke*, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012)).

We agree with the State that the Motion to Recuse was procedurally deficient. The motion was not supported by an affidavit as required by Supreme Court Rule 10B, section 1.01. Moreover, Petitioner did not raise the issue in a timely manner. Petitioner waited over twenty-three months from the filing of his petition before seeking recusal on the basis of the post-conviction judge's comments at Petitioner's sentencing hearing. We conclude that Petitioner's failure to raise this issue in a timely manner results in waiver of this issue. *See State v. Jamie Jones*, No. W2016-00491-CCA-R3-CD, 2017 WL 2493686, at *8 (Tenn. Crim. App. June 9, 2017) (concluding that the defendant's delay of fifteen months before seeking recusal on the basis of the trial court's comments at a bond hearing resulted in waiver of the issue), *perm. app. denied* (Tenn. Oct. 6, 2017); *Robert Guerrero v. State*, No. M2014-00348-CCA-R3-PC, 2015 WL 4484538, at *8 (Tenn. Crim. App. July 23, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015); *Freeman*, 2013 WL 160664, at *4.

Furthermore, we find no evidence of judicial bias. The Motion to Recuse alleged that the post-conviction judge improperly sentenced Petitioner and that this court noted the judge's "bias" in its opinion on direct appeal. However, adverse rulings by a trial court do not, standing alone, establish judicial bias requiring recusal of the trial court. *See Herrera*, 944 S.W.2d at 392. Although the judge expressed frustration with the jury's verdict at Petitioner's sentencing hearing, a review of the record indicates that the frustration was not directed at Petitioner personally but at the seeming inconsistency in the jury's verdict; the jury found Petitioner guilty of aggravated robbery but not guilty of felony murder. This court did not determine that the judge was biased against Petitioner on direct appeal; ultimately, we affirmed the sentences imposed by the post-conviction judge. *See Stevie Gibson*, 2014 WL 4100158, at *13-14. Moreover, the post-conviction

judge indicated at the hearing on the Motion to Recuse that he did not recall Petitioner's case and that he had "no animosity towards [Petitioner][.]" Finally, Petitioner's new allegations concerning the judge's actions during the post-conviction hearing are unsupported by the record and/or fail to show bias. Waiver notwithstanding, Petitioner is not entitled to relief on this issue.

*Ineffective Assistance of Counsel*

Petitioner contends that trial counsel rendered ineffective assistance based on trial counsel's failure to use Petitioner's voluntary intoxication as a defense to the charges against him. The State responds that Petitioner has failed to establish any deficiency by trial counsel.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579; *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

In this case, we agree with the post-conviction court that Petitioner failed to establish deficient performance on the part of trial counsel. Petitioner alleged in his Amended Petition that trial counsel should have presented a voluntary intoxication defense and used evidence of Petitioner's history of drug use to negate his intent to commit the crimes. However, trial counsel testified that Petitioner gave a statement to police that alleged self-defense and that his trial strategy was to use Petitioner's statement

- 23 -

to police to prove self-defense. Trial counsel determined that self-defense was the only viable defense under the circumstances. Petitioner told police officers and his family that he acted in self-defense, and his family members also reported to police that Petitioner acted in self-defense. Additionally, Petitioner told trial counsel that he stabbed the victim in self-defense, and Petitioner's description of what happened was consistent throughout the proceedings. Trial counsel stated that a claim of voluntary intoxication would have been "totally inconsistent" with what Petitioner told police and his family and that there was "no real question about [Petitioner's] mental state."

Trial counsel discussed Petitioner's drug use with Petitioner and Petitioner's family, but trial counsel stated that he did not have "any reason to believe" that Petitioner's drug use "was a factor in his decision to act as he did on that evening." Trial counsel stated that his strategy on the aggravated robbery charge was to attack the sufficiency of the evidence relating to whether a robbery had even occurred. Accrediting the testimony of trial counsel, the post-conviction court determined that the defense strategy of self-defense was consistent with the evidence and agreed with trial counsel that "there was very little proof" that Petitioner robbed the victim. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d at 790.

Petitioner additionally asserts in his brief that trial counsel's performance was deficient because trial counsel: (1) "did not establish or put forth a defense to the charge of aggravated robbery"; (2) relied upon the claim of self-defense without any investigation or research; (3) failed to attack all of the elements of each offense; (4) failed to "interview multiple witnesses"; and (5) failed to seek "expert or investigative assistance." However, because Petitioner did not include these additional claims in his Amended Petition and has raised them for the first time on appeal, the claims are waived. *See* Tenn. Sup. Ct. R. 28, § 8(D)(4) (the scope of post-conviction hearings is limited to the issues raised in the post-conviction petition); *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). Petitioner is not entitled to relief.

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE